1

2

3

4

5

6

7

8

**UNITED STATES DISTRICT COURT**

9

**EASTERN DISTRICT OF CALIFORNIA**

10

11 ANGELA CONTI and JUSTINE MORA, )   Case No.: 1:19-cv-0769 JLT SKO
   individuals, on behalf of themselves and on )
12 behalf of all persons similarly situated, )   ORDER GRANTING PLAINTIFFS' MOTION
                                            )   FOR FINAL APPROVAL OF THE CLASS
13                Plaintiffs, )   SETTLEMENT
                                            )   (Doc. 46)
14        v. )
                                            )   ORDER GRANTING PLAINTIFFS' MOTION
15 L'OREAL USA S/D, INC., et al., )   FOR FEES, COSTS, AND SERVICE AWARDS
                                            )   (Doc. 45)
16                Defendants. )
                                            )
17 _____ )

18        Angela Conti and Justine Mora assert that L'Oreal USA S/D Inc. failed to comply with wage

19 and hour laws by failing to pay all wages due and provide proper meal and rest breaks.  Plaintiffs now

20 seek final approval of a class settlement reached in this action.  (Doc. 46.)  In addition, Plaintiffs seek

21 attorneys' fees and costs from the settlement fund, costs for settlement administration, and service

22 awards for the class representatives.  (Doc. 45.)  L'Oreal does not oppose these requests, and no class

23 member submitted objections to the settlement terms.  The Court found the matters suitable for decision

24 without oral arguments pursuant to Local Rule 230(g), and the hearing for final approval was vacated.

25        Because Plaintiffs have met their burden to demonstrate certification of the Settlement Class is

26 appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

27 fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  The

28 request for attorneys' fees is granted in the amount of **$106,250.00**; litigation costs are awarded in the

1

1   amount of **$12,000.00**; settlement administration costs are granted in the amount of **$10,725.58**; and

2   service awards are granted to each class representative in the amount of **$5,000.00**.

3   <u>**BACKGROUND**</u>

4        L'Oreal is a retail corporation that conducts business throughout California and employed

5   Plaintiffs as hourly, non-exempt employees.  (Doc. 1 at 146.)  Plaintiffs worked as vendors at L'Oreal

6   makeup counters operated within Macy's department stores.  (Doc. 39 at ¶ 3.)  Plaintiffs bring claims

7   against L'Oreal for labor violations related to overtime calculations and meal and rest breaks.

8        Plaintiffs allege L'Oreal required employees submit to "loss prevention inspections" at the

9   beginning and end of each shift while employees were "off the clock."  (Doc. 1 at 148.)  Plaintiffs

10  contend these practices resulted in forfeited overtime wages for employees who were caused to work

11  without the time being correctly recorded during the loss prevention inspections.  (*Id.*)  Plaintiffs allege

12  the company policies also prevented proper meal and rest breaks, for which they did not receive proper

13  compensation.  (*Id.* at 148-150.)  According to Plaintiffs, Defendant also failed to provide complete and

14  accurate wage statements.  (*Id.* at 150.)

15       Plaintiffs initiated this action by filing a complaint in Fresno County Superior Court.  (Doc. 1 at

16  2, 6-43.)  Plaintiffs then filed a First Amended Complaint.  (*Id.* at 44.)  After receiving leave, Plaintiffs

17  (*Id.* at 2, 96-97), Plaintiffs filed their Second Amended Complaint—which remains the operative

18  pleading—and identified the following causes of action: (1) unfair competition of violation of Cal. Bus.

19  & Prof. Code § 17200; (2) failure to pay overtime wages in violation of Cal. Lab. Code §§ 510, *et seq.*;

20  (3) meal periods violations under Cal. Lab. Code §§ 226.7 and 512 and the applicable Industrial

21  Welfare Commission Orders; (4) rest periods violations under Cal. Lab. Code §§ 226.7 and 512 and the

22  applicable IWC Wage Order; (5) failure to provide accurate, itemized statements in violation of Cal.

23  Lab. Code § 226; (6) failure to provide wages due in violation of Cal. Lab. Code §§ 201, 202, and 203;

24  (7) violations of the Private Attorneys General Act; and (8) failure to pay overtime compensation in

25  violation of the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* (*Id.* at 145; *see also id.* at 145-86.)

26  Following the addition of the FLSA claim in the Second Amended Complaint, Defendant filed its

27  Notice of Removal to this Court.  (Doc. 1.)

28       The parties engaged in "formal and informal discovery," including "assembling data for

2

calculating damages." (*See* Doc. 9-1 at 9.)  In 2019, the parties participated in mediation with Jeffrey A. Ross, who Plaintiffs note is a "respected mediator of wage and hour class actions." (*Id.* at 10; Doc. 46-1 at 7.)  Plaintiffs report the parties settled "pursuant to the terms of mediator's proposal." (Doc. 46-1 at 7.)

Plaintiffs moved for preliminary approval of the executed "Class Action Settlement Agreement." (Doc. 9.)  The Court reviewed the proposed settlement and identified concerns that precluded certification under Rule 23, including: the adequacy of Plaintiffs as class representatives; whether there was sufficient commonality between the class members; and whether Plaintiffs' experience was typical, or if the class injuries were "based on conduct which is not unique to the named plaintiffs." (Doc. 13 at 9-12.)  The Court observed the FLSA claim was added to the action after the parties had agreed upon the settlement terms, for the purpose of removing the case to federal court. (*Id.* at 17.)  However, the FLSA claim was not mentioned in the motion for preliminary approval, and no value was assigned to the FLSA claim, separate and apart from the other alleged claims in the complaint. (*Id.*)  The Court also noted that Plaintiffs did not submit evidence demonstrating the existence of employment practices or policies common to all putative members of the settlement class. (Doc. 16 at 2.)  Thus, the Court declined preliminary approval.[1]  (*Id.*; Doc. 16.)

The parties then executed a "Stipulation to Amend the Class Action Settlement Agreement," modifying the provisions addressing the class representative service payments and attorneys' fees. (Doc. 46-2 at 78-81.)  Plaintiffs moved for approval of the amended settlement, asserting the motion— with new supporting evidence—addressed "all the issues raised by the Court." (Doc. 28-1 at 8.)  The Court granted preliminary approval of the proposed settlement. (Doc. 41.)  The Court appointed Conti and Mora as the Class Representatives, and authorized them to seek service awards up to $5,000.00 each, "subject to a petition and review" at the final approval stage. (*Id.* at 28.)  In addition, the Court appointed the firm of Blumenthal Nordrehaug Bhowmik De Blouw LLP as Class Counsel. (*Id.*)  The Court preliminarily granted "Class Counsel's request for fees not to exceed $106,250 and costs up to

---

[1] Magistrate Judge Sheila K. Oberto conducted the initial analysis of the request for preliminary approval, who issued Findings and Recommendations on January 27, 2020.  (Doc. 13.)  The Findings and Recommendations were adopted by District Judge Dale A. Drozd on February 19, 2020.  (Doc. 16.)

3

1    $12,000," noting the requests were also subject to review.  (*Id.*)  Finally, the Court appointed ILYM

2    Group. as the Settlement Administrator, and authorized costs up to $15,000 for the administration.  (*Id.*)

3          The Court approved the Class Notice that conveyed this information for Class Members.  (Doc.

4    44; *see also* Doc. 43 at 5-17.)  The Class Notice identified the settlement class approved by the Court,

5    claims and issues to be resolved, representation by counsel, how to be excluded from the class,

6    deadlines for any requests for exclusion and objections, and the binding effect of a class judgment.

7    (*See* Doc. 43 at 5-17.)

8          The Settlement Administrator mailed the Class Notice to 408 Class Members.  (Doc. 46-3 at 3,

9    Nava Decl. ¶ 8.)  Madely Nava, a case manager for the Settlement Administrator, reports that if a

10   mailed Class Notice was returned by the USPS as undeliverable and without a forwarding address,

11   "ILYM Group performed a computerized skip trace."  (*Id.* at 4, ¶ 8.)  She reports that ILYM performed

12   skip traces for 70 returned Class Notice Packages, and obtained 40 updated addresses.  (*Id.*)  The

13   Settlement Administrator reports that 30 Notice Packets remained undeliverable, because ILYM was

14   unable to find updated addresses.  (*Id*, ¶ 10.)  No requests for exclusion were submitted by Class

15   Members.  (*Id.*, ¶ 11.)  In addition, no objections to the agreement terms were received by either the

16   Settlement Administrator or the Court.  (*See id.*, ¶¶ 12.)

17         Plaintiffs have now moved for approval of the attorneys' fees, costs, and service awards and for

18   final approval of the settlement.  (Docs. 45-46.)  L'Oreal does not oppose the motion for final approval

19   of the settlement (Doc. 48), but has stated no position as to the remaining motions.

20                                    **SETTLEMENT TERMS**

21         Pursuant to the "Class Action Settlement Agreement" and the "Stipulation to Amend the Class

22   Action Settlement Agreement" (collectively, "the Settlement"), the parties agree to a gross settlement

23   amount of $425,000.00 for the class defined as: "all individuals who are or previously were employed

24   by Defendant who worked in California, were classified as non-exempt, and who separated from their

25   employment between March 6, 2014 and February 20, 2018."  (Doc. 46-2 at 32 § I(E); *id.* at 34 § I(T).)

26   The Settlement also includes an "escalator clause," under which the gross settlement amount will be

27   "increased proportionally" if the total number of workweeks for Class Members increased by more than

28

                                            4

1  5% of the number estimated at the time of execution.[2]  (*Id.* at 39, § III(C)(7).)

2  **I.      Payment Terms**

3          The gross settlement fund will cover all payments to class members, including service payments

4  to Plaintiffs as the class representatives.  (Doc. 46-2 at 34, § I(T); *see also id.* at 79-80.)  In addition, the

5  Settlement provides for payments to Class Counsel for attorneys' fees and expenses, to the Settlement

6  Administrator, and the California Labor & Workforce Development Agency.  (*Id.*)  Specifically, the

7  Settlement provides for the following payments from the gross settlement amount:

8          • The Class Representatives will each receive service awards up to
             $5,000;

9
10         • Class counsel will receive up to $106,250.00 for attorneys' fees, which
             equals 25 % of the gross settlement, and expenses up to $12,000;

11         • The California Labor and Workforce Development Agency shall
12           receive $37,500 from the total PAGA payment of $50,000, with the
             remaining $12,500 being paid to aggrieved employees; and

13         • The Settlement Administrator will receive up to $15,000 for
             administration expenses.

14

15  (*Id.* at 37, § III(B); *id.* at 79-80, amended § III.(B)(1)-(2).)  After these payments, the remaining

16  money ("Net Settlement Amount") will be distributed to class members.  (*Id.* at 24, § I (V); *id.* at 38, §

17  III(C).)  If the Court approves payments from the gross fund that are less than the amounts designated

18  above—including lesser amounts for the class representative, attorneys, the LWDA, or the settlement

19  administrator— the remainder will be "retained in the Net Settlement Amount for distribution to

20  Participating Class Members."  (*Id.* at 37-38, § III.B; *id.* at 79-80, amended § III(B)(1)-(2).)  The Net

21  Settlement Amount is currently expected to be $236,024.42.  (Doc. 46-3 at 5, Nava Decl. ¶ 14.)

22          Class members are not required to submit a claim to receive a share from the Net Settlement

23  Amount.  (Doc. 46-2 at 38, § III(C).)  Class members' shares will be distributed on a *pro rata* basis,

24  based upon the number of weeks worked by Participating Class Members during the applicable Class

25  Period.  (*Id.*, § III(C)(2).)  Specifically, the Settlement provides:

26          The Settlement Share for each Participating Class Member will be

27
28  _____

[2] The Settlement indicates L'Oreal "estimated that the Class is comprised of 412 Class Members who worked approximately 16,536 workweeks during the Class Period."  (Doc. 46-2 at 39, § I(C)(7).  In addition, L'Oreal "also estimated that there are 342 Aggrieved Employees who worked approximately 12,111 pay periods through October of 2018."  (*Id.*)

calculated by (a) dividing the Net Settlement Amount by the total number of workweeks of all Participating Class Members worked during the Class Period to determine the value of each workweek and (b) multiplying the result by each individual Participating Class Member's total number of workweeks worked as a Class Member during the Class Period according to Defendant's records.

(*Id.*)  Thus, the exact amount settlement class members receive depends upon how many weeks they worked for L'Oreal, and whether they are entitled to a portion allocated for the release of PAGA claims.[3]  However, the Settlement Administrator reports that if the Court approves each of the proposed payments from the gross fund—including the maximum attorney fees and class representative awards—the average settlement share is expected to be $584.59.  (Doc. 46-3 at 5, Nava Decl. ¶ 14.)

The appointed Settlement Administrator will distribute payment by mailing checks to all participating Class Members and Aggrieved Employees.  (Doc. 46-2 at 39-40, § III(D).)  Checks must be cashed within 180 days of the mailing.  (*Id.*, at 47, § III(E)(10).)  If any check remains uncashed after 120 days, the Settlement Administrator will send a letter stating "that unless the check is cashed in the next 60 days, it will expire and become non-negotiable, and offer to replace the check if it was lost or misplaced but not cashed."  (*Id.* at 48.)  If the funds remained uncashed by the end of that 60 day period, the money does not revert to L'Oreal.  (*Id.*)  Rather, "the funds from such uncashed checks will be deposited [by the Settlement Administrator] with the Unclaimed Property fund maintained by the Controller for the State of California."  (*Id.*)

## II.    Releases

The Settlement provides that Plaintiffs and class members, other than those who elect not to participate in the Settlement, release L'Oreal[4] from claims arising in the relevant period.  For Participating Class Members, the Settlement provides:

Upon entry of final judgment, Plaintiffs and the Participating Class Members shall release all claims alleged in the operative complaint

---

[3] PAGA Payment Shares "will be calculated by (a) dividing the PAGA Payment net of the LWDA Payment by the total number of workweeks of all Aggrieved Employees worked during the PAGA Period to determine the value of each workweek and (b) multiplying the result by each individual Aggrieved Employee's total number of workweeks worked as an Aggrieved Employee during the PAGA Period according to Defendant's records."  (Doc. 46-2 at 38-39, § III(C)(4).)

[4] The Settlement defines "Released Parties" as including "Defendant L'Oreal USA S/D, Inc. and all its former and present parents, subsidiaries, and affiliates, and their officers, directors, employees, partners, shareholders, insurers, attorneys, and agents, and any other successors, assigns, or legal representatives."  (Doc. 46-2 at 35, § I(BB).)

6

(including any amended complaint filed prior to Final Approval) or which could have been alleged based on the asserted facts regardless of whether such claims arise under federal, state and/or local law, statute, ordinance, regulation, common law, or other source of law, which occurred during the Class Period, and a release from the State of California of all PAGA claims based on the Labor Code violations alleged in the operative complaint which occurred during the time period of March 6, 2017 to April 20, 2019 ("Released Claims"). The Released Claims shall specifically include all claims under the laws alleged in the operative complaint, as well as any and all claims, causes of action, damages, wages, premiums, penalties, attorneys' fees, costs, and any other form of relief or remedy in law, equity, of whatever kind or nature and for any relief whatsoever, including monetary, injunctive, or declaratory relief, whether direct or indirect, whether under federal law or the law of any state, whether suspected or unsuspected, whether known or unknown, which the Plaintiffs or any Participating Class Member has against the Released Parties or any of them for any acts occurring during the Class Period that were pled or could have been pled in the Action based on the facts, subject matter or the factual or legal allegations in the Action including claims that are based upon or arise out of the California Labor Code or any similar provision of federal, state or local law. These Released Claims exclude claims of wrongful termination, unemployment insurance, social security, disability, and workers' compensation, and class claims outside of the Class Period and PAGA claims outside of the time period of March 6, 2017 to April 20, 2019.

(Doc. 46-2 at 48, § III(F)(1).)  In addition, the Class Notice informed Class Members that the "**release specifically includes claims under the federal Fair Labor Standards Act based on the facts or theories raised in this lawsuit. If you do not exclude yourself from this settlement, you will have waived those claims**."  (Doc. 46-3 at 11, emphasis in original.)

The release for Conti and Mora encompasses more claims than those identified for Settlement Class Members, because they agreed to release any claims known and unknown against L'Oreal, not just those claims constrained to the allegations in this action.  Specifically, Plaintiffs' release provides:

**Plaintiffs.** As of the date the Settlement becomes Final, Plaintiffs hereby fully and finally releases Defendant and the other Released Parties from any and all claims, demands, rights, liabilities and causes of action of every nature and description whatsoever, known or unknown, asserted or that might have been asserted, whether in tort, contract, or for violation of any local, state, or federal statute, rule, regulation, ordinance or common law including but not limited to those claims raised in the Action and/or that could have been raised in the Action, those arising from or related to their employment with Defendant or the termination thereof during the Class Period, and any other claims of any nature or origin whatsoever ("Plaintiffs' Released Claims"). This release excludes only the release of claims not permitted by law.

**Plaintiffs' Waiver of Rights Under California Civil Code Section 1542.** As partial consideration for the Class Representative Service Payments, the Plaintiffs' Released Claims shall include all such claims, whether

7

known or unknown by the releasing party. Thus, even if Plaintiffs discover facts and/or claims in addition to or different from those that they now know or believe to be true with respect to the subject matter of the Plaintiffs' Released Claims, those claims will remain released and forever barred. Therefore, with respect to Plaintiffs' Released Claims, Plaintiffs expressly waive and relinquishes the provisions, rights and benefits of section 1542 of the California Civil Code, which reads:

**A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release, and that if known by him or her would have materially affected his or her settlement with the debtor or released party.**

(Doc. 46-2 at 49, § III(F)(2)-(3), emphasis in original.)  Thus, claims released by Plaintiffs—but not the Settlement Class—include any claims arising under Title VII, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act.

### III.    Objections and Opt-Out Procedure

The "Notice of Pendency of Class Action Settlement" explained to Class Members they "do **not** have to do anything" to receive a payment from the Settlement.  (Doc. 46-3 at 8, emphasis in original.)  However, any class member who wished had an opportunity to file objections to the terms or request exclusion from the Settlement Class.  (Doc. 46-2 at 43-44, § III(E)(3).)  The Class Notice explained the procedures to object to the terms and request exclusion, and informed individuals any objections or requests for exclusion were to be postmarked no later than January 26, 2023.  (Doc. 46-3 at 9-10.)

### IV.    Service of the Class Notice Packets and Responses Received

Madely Nava, a case manager for the Settlement Administrator, reports the Notice was mailed to 408 Class Members via the United States Postal Service on December 12, 2022.  (Doc. 46-3 at 3, Nava Decl. ¶ 7.)  Ms. Nava also reports the Settlement Administrator did not receive any requests for exclusion or objections from Class Members.  (*Id.* at 4, ¶¶ 11-12.)  Likewise, the Court did not receive any objections to the Settlement.

### APPROVAL OF A CLASS SETTLEMENT

When parties settle the action prior to class certification, the Court has an obligation to "peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

8

1    *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the

2    proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

3    *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

4    the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

5    **I.      Certification of a Settlement Class**[5]

6            Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

7    provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

8    of all."  Fed. R. Civ. P. 23(a).  Parties seeking class certification bear the burden of demonstrating the

9    elements of Rule 23(a) are satisfied, and "must affirmatively demonstrate … compliance with the

10   Rule."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell,*

11   *Inc.*, 563 F.2d 1304, 1308 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court

12   must consider whether the class is maintainable under one or more of the three alternatives set forth in

13   Rule 23(b).  *Narouz v. Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

14           Under the terms of the Settlement, the class is defined as: "all individuals who are or previously

15   were employed by Defendant who worked in California, were classified as non-exempt, and who

16   separated from their employment between March 6, 2014 and February 20, 2018."  (Doc. 46-2 at 32 §

17   I(E).)  Plaintiffs asserted this class satisfies the requirements of Rule 23.  (Doc. 28-1 at 25-31.)

18           **A.      Rule 23(a) Requirements**

19           The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

20   by the named plaintiff's claims."  *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

21   155-56 (1982).  Certification of a class is proper if:

22                    (1) the class is so numerous that joinder of all members is impracticable;
                     (2) there are questions of law or fact common to the class; (3) the claims
23                   or defenses of the representative parties are typical of the claims or
                     defenses of the class; and (4) the representative parties will fairly and
24                   adequately protect the interests of the class.

25   Fed. R. Civ. P. 23(a).  These prerequisites are generally referred to as numerosity, commonality,

26   typicality, and adequacy of representation.  *Falcon*, 457 U.S. at 156.

27

28   _____
     [5] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the
     Settlement Class is required.

### 1.   Numerosity

This prerequisite requires the Court to consider "specific facts of each case and imposes no absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Although there is not a specific threshold, joining more than one hundred plaintiffs is impracticable. *See Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir. 2002) (finding the requirement "satisfied solely on the basis of the number of ascertained class members"); *Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir. 1977) (a proposed class with 110 members "clearly [included] a sufficient number to meet the numerosity requirements"). The Settlement Administrator reports there are 408 Class Members. (Doc. 46-3 at 5, Nava Decl. ¶ 13.) Joinder of all identified Class Members is impracticable, and the numerosity requirement is satisfied.

### 2.   Commonality

Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and law. *See Wal-Mart Stores*, 564 U.S. at 350. Thus, "commonality requires that the class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012) (internal quotation marks, citations omitted). In an employment context, this inquiry is satisfied when the entire class was injured by the same system-wide policy or practice. *See Goodwin v. Winn Management Group LLC*, 2017 WL 3173006, at *5 (E.D. Cal. 2017).

Plaintiffs asserts the commonality requirement is satisfied because there are common questions of fact and law, including: "whether Defendant's security check practices were lawful, whether Defendant failed to properly pay wages for time worked during security checks, whether Defendant failed to properly provide meal and rest periods as a result of on premise duties, whether Defendant's conduct was willful, and whether the Class is entitled to compensation and related penalties." (Doc. 28-1 at 27.) Plaintiffs assert that employees were subject to common policies and practices concerning security checks and meal and rest periods. (Docs. 28-1 at 7; *see also* Doc. 28-3 at 2, Conti Decl. ¶¶ 3-4;

Doc. 28-4 at 2, Mora Decl. ¶¶ 3-4.)

Plaintiffs report that under Defendant's official practices, non-exempt employees could not clock in or out until they "ma[de] a phone call at the sales counter" and underwent a "loss prevention inspection while not clocked in that took an average of approximately 15 minutes." (Doc. 28-3 at 2-4, Conti Decl. ¶¶ 4-5; Doc. 28-4 at 2-4, Mora Decl. ¶¶ 4-5.) Plaintiffs also provided the Court with "Vendor Guidelines," which Plaintiffs describe as "uniformly impos[ing] on premise duties and required security checks." (Docs. 28-1 at 27; Doc. 28-2 at 83-88.) Plaintiffs and Class Members were subject to these guidelines while they worked as vendors at L'Oreal makeup counters operated inside Macy's stores.[6] (Doc. 39 at ¶ 3.)

Because it appears resolution of the identified issues—such whether Defendant's practices and policies violated wage and hour laws—apply to the claims of each of the Class Members, the Court finds the commonality requirement is satisfied for purposes of settlement.

### 3.   Typicality

This requirement demands that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). A claim or defense is not required to be identical, but rather "reasonably coextensive" with those of the absent class members. *Hanlon*, 150 F.3d at 1020. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs have the same claims as other members of the class and are not subject to unique defenses).

Plaintiffs assert that typicality is met because "like every other member of the Class, [Plaintiffs were] employed by Defendant as a non-exempt employee during the class period" and "subject to the same employment practices concerning security checks, meal and rest periods. (Doc. 28-1 at 28, citing Conti Decl. ¶¶ 2, 5 [Doc. 28-3] and Mori Decl. ¶¶ 2, 5 [Doc. 28-4].) Because Plaintiffs were subjected

---

[6] These guidelines were in effect during the Class Period for this settlement, but L'Oreal has since ceased operating as a vendor inside Macy's stores. (Doc. 39 at ¶ 4.)

to the same policies and wage payment procedures as the Settlement Class, the typicality requirement is satisfied for purposes of settlement.  *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

### 4.   Fair and Adequate Representation

This prerequisite is satisfied if the representative "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).  "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?"  *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citation omitted).

### a.   Class representative

Previously, Conti and Mora were appointed as the Class Representatives.  According to Plaintiffs, Defendant "disputes that Plaintiffs are adequate" representatives but "does not oppose a finding that Plaintiffs are adequate to represent the Class for settlement purposes only."  (Doc. 28-1 at 29.)  Plaintiffs reported there is "no antagonism between the interests of Plaintiffs and those of the Class" because "Plaintiffs and the Class Members seek monetary relief under the same set of facts and legal theories."  (*Id.* at 29.)  Plaintiffs also asserted they "actively participated in the prosecution of this case to date" because they "effectively communicated with counsel[;] provided documents to counsel[;] and participated extensively in discovery, investigation and negotiations."  (*Id.* at 28-29.)

Neither party identified conflicts between Conti, Mora, and the Settlement Class members. Based upon the information provided, Plaintiffs have actively endeavored to prosecute claims on behalf others similarly situated.  Moreover, the interests of Plaintiffs are aligned with those of the class members: to maximize the recovery for the alleged violations of wage and hour laws.  Thus, it appears Plaintiffs fairly and adequately represented the interests of the Settlement Class.

### b.   Class counsel

The law firm of Blumenthal Nordrehaug Bhowmik De Blouw LLP was appointed as counsel for the Settlement Class at the preliminary approval stage.  Counsel reports the firm has "extensive experience in class action litigation in California, and in particular, wage and hour litigation."  (Doc. 28-2 at 16, Nordrehaug Decl. ¶ 28.)  Counsel asserts the firm has "been involved as class counsel in hundreds of wage and hour actions."  (*Id.* at 16-17.)  Defendant made no objection to the firm's

appointment.  Therefore, the Court finds Class Counsel meets the adequacy requirement.

**B.      Certification of a Class under Rule 23(b)(3)**

For the foregoing reasons, the prerequisites of Rule 23(a) are satisfied by the Settlement Class. However, a class may only be certified if it is also maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Plaintiffs contend certification of the proposed settlement class is appropriate under Rule 23(b)(3).  (Doc. 28-1 at 29-31.)

Under Rule 239(b)(3), a class is maintainable if (1) "questions of law or fact common to the members of the class predominate over any questions affecting only individual members" and (2) "a class action is superior to other available methods for fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  These are referred to as the "predominance" and "superiority" requirements.  *See Hanlon*, 150 F.3d at 1022-23; *see also Wal-Mart Stores*, 564 U.S. at 363 ("(b)(3) requires the judge to make findings about predominance and superiority before allowing the class").

1.      Predominance

The predominance inquiry focuses on "the relationship between the common and individual issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help achieve judicial economy.'" *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009) (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

Plaintiffs contend the predominance requirement is satisfied because "the adjudication of the common issues as to Defendant's uniform and systematic employment policies applicable to non-exempt employees during the Class Period could establish Defendant's liability on a class-wide basis." (Doc. 28-1 at 30.)  For example, Plaintiffs assert that "Defendant engaged in a uniform course of imposing security check inspections, which resulted in a failure to properly for all time worked and provide legally compliant meal and rest periods, and that Defendant's policies with respect to these issues are uniform as evidenced by the 'Vendor Guidelines'."  (*Id.*)  Based upon the allegations presented in the Second Amended Complaint—and the supporting evidence—the Court finds adjudication of the claims via a class action promotes judicial economy, because the claims are based

upon company, class-wide policies and procedures.

### 2. Superiority

The superiority inquiry requires a determination of "whether objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at 1023 (citation omitted). This tests whether "class litigation of common issues will reduce litigation costs and promote greater efficiency." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). Pursuant to Rule 23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the desirability of concentrating claims in one forum, and (4) difficulties with the management of the class action. *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the factors identified in Rule 12(b)(3) address the "superiority" analysis).

### a. Class members' interest in individual litigation

The Court is directed to consider "the class members' interests in individually controlling the prosecution or defense of separate actions." Fed. R. Civ. P. 23(b)(3)(A). This factor is most relevant when class members "suffered sizeable damages or [have] an emotional stake in the litigation." *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011). The Ninth Circuit explained that "[w]here damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190.

As noted above, the Settlement Administrator reports there were no requests for exclusion or objections. (Doc. 46-2 at 4, Nava Decl. ¶¶ 11-12.) Thus, there is no indication any Class Members desire to control this action or proceed with individual litigation. The anticipated payments to Class Members are not particularly large, as the estimated average payment is $584.59 and the highest payment is $2,849.49. (*Id.* at 5, ¶ 14.) It is unlikely that individuals would pursue such small claims. *See Zinser*, 253 F.3d at 1190; *Thieriot v. Celtic Ins. Co.*, 2011 WL 1522385, at *4 (N.D. Cal. Apr. 21, 2011) (noting the average payment of $2,462 was "relatively small[]" and supported a finding the class action was a superior to individual cases). As this Court previously observed, "When the individual claims of class members are small, the class action facilitates the spreading of the litigation costs among the numerous injured parties." *Monterrubio v. Best Buy Stores, L.P.*, 291 F.R.D. 443, (E.D. Cal.

2013) (internal quotation marks, citation omitted).  Thus, the factor weighs in favor of certification.

### b.    Other litigation

Next, the Court considers "the extent and nature of any litigation concerning the controversy already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  The parties have not identified any other litigation related to the claims addressed raised by Plaintiffs or encompassed in this Settlement.  Therefore, this factor weighs in favor of class certification.

### c.    Concentration in one forum

Third, the Court must consider "the desirability or undesirability of concentrating the litigation of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  There is no suggestion the Eastern District is an undesirable forum for the matter, which raises wage and hour claims under California law on behalf of employees throughout the state.  *See United States ex rel. Terry v. Wasatch Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of certification where the proposed class was compromised of individuals located in California and involved "California state law claims").  Moreover, as this Court previously explained, when "parties … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one forum is obvious."  *Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009) (internal quotation marks, citation omitted).  Therefore, this factor weighs in favor of certification.

### d.    Management of the action

Finally, the Court must consider "the likely difficulties in managing a class action."  Fed. R. Civ. P. 23(b)(3)(D).  The Supreme Court explained that, in general, "manageability … encompasses the whole range of practical problems that may render the class format inappropriate for a particular suit."  *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Because the parties reached an agreement for the class claims and identified the Settlement Class, it does not appear there are any problems with managing the action.  *See Espinosa v. Ahearn*, 926 F.3d 539, 556-57 (9th Cir. 2019) ("manageability is not a concern in certifying a settlement class where, by definition, there will be no trial").  Further, the Court need not speculate as to manageability if the case proceeded to trial.  *See Amchem Prods.*, 521 521 U.S. at 620 ("with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems").

1    Consequently, this factor weighs in favor of certification.

2    **II.      Evaluation of the Settlement Terms**

3            Settlement of a class action requires approval of the Court, which may be granted "only after a

4    hearing and on finding that [the settlement] is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

5    Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the

6    class. *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985). Toward that end,

7    "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in

8    determining whether a settlement is 'fair, reasonable, and adequate.'" *Briseño v. Henderson*, 998 F.3d

9    1014, 1023 (9th Cir. 2021); *see* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018). Rule 23(e)(2) now

10   directs the Court to consider whether:

11            (A) the class representatives and class counsel have adequately represented
                 the class;
12            (B) the proposal was negotiated at arm's length;
             (C) the relief provided for the class is adequate, taking into account:
13                  (i) the costs, risks, and delay of trial and appeal;
                    (ii) the effectiveness of any proposed method of distributing relief to
14                  the class, including the method of processing class-member claims;
                    (iii) the terms of any proposed award of attorney's fees, including
15                  timing of payment; and
                    (iv) any agreement required to be identified under Rule 23(e)(3); and
16            (D) the proposal treats class members equitably relative to each other.

17   Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24. The Ninth Circuit determined this

18   revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[7]

19            **A.      Representation of the Class**

20            To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether

21

22   [7] Previously, the Ninth Circuit had identified several factors to determine whether a settlement agreement meets these
     standards, including:
23
24            the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further
              litigation; the risk of maintaining class action status throughout the trial; the amount offered in
              settlement; the extent of discovery completed, and the stage of the proceedings;
25            the experience and views of counsel; the presence of a governmental participant; and the reaction
              of the class members to the proposed settlement.
26
27   *Staton*, 327 F.3d at 959 (citation omitted). Following *Briseño*, the Court focuses its analysis on the factors enumerated in
     Rule 23. *See Briseño*, 998 F.3d at 1026; *see also Herrera v. Wells Fargo Bank, N.A.*, 2021 U.S. Dist. LEXIS 170195, at
28   *21 (C.D. Cal. June 8, 2021) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the
     core concerns of procedure and substance that should guide the decision whether to approve the proposal") (quoting Fed.
     R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes).

                                                      16

the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v. Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021).  In addition, a finding that "Class Counsel are experienced and competent" supports a conclusion that the class is adequately represented.  *Id.*; *see also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Mandalevy v. Bofi Holding, Inc.*, 2022 WL 1556160, at *6 (S.D. Cal. May 17, 2022) (quoting 4 William B. Rubenstein, Newberg on Class Actions § 13:48 (5th ed. 2020)).

Plaintiffs' interests appear aligned with those of class members, as they share a common interest in challenging the alleged wrongful wage and hour policies.  Plaintiffs and the Settlement Class also "seek monetary relief under the same set of facts and legal theories."  (Doc. 28-1 at 29.) Further, Class Counsel are clearly experienced in class action litigation.  (*See* Doc. 28-2 at 16-17.) Because Plaintiffs carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the requirement under Rule 23(e)(2) is also satisfied.  *See Flores v. Dart Container Corp.*, 2021 WL 1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

### B.    Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B).  The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009).  The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960.  The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." *In re Bluetooth Headset Prods.*

*Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted).  Thus, the Court must consider whether the settlement is truly the product of arm's length bargaining—as Plaintiffs assert (Doc. 46-1 at 12, 17)— or if the agreement is the product of collusion or fraud.  *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

When a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947; *see also Briseño*, 998 F.3d at 1023.  These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund." *Id.* (internal quotations, citations omitted).

### 1.    Whether there is a disproportionate distribution to counsel

The Settlement provides that Class counsel may request attorneys' fees up to $106,250.00, which is one-quarter of the gross settlement fund.  (Doc. 46-2 at 80, amended § III(B)(2).)  The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark.  *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the fees requested are equal to the benchmark identified by the Ninth Circuit, the Court finds the Settlement Agreement does not provide a disproportionate distribution to Class Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015) (finding no disproportionate distribution where class counsel was to receive a third of the settlement fund "although significantly above the benchmark for this Circuit," because it was "not unreasonable as an upper bound" of fees awarded in the Circuit).

### 2.    Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of

18

attorneys' fees separate and apart from class funds." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 947.  However, the Ninth Circuit recognized also a "clear sailing" arrangement exists when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

Though the settlement agreement originally contained a version of the clear sailing provision, the parties removed it by stipulation.  (Doc. 46-2 at 79-80, amended § III(B)(2).)  As discussed below, the Court finds an award from the common fund is appropriate and the fees to be awarded are reasonable in light of the work completed and results obtained.  Therefore, this factor does not weigh against final approval of the settlement.  *See Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan 24, 2019) (not finding collusion, though the defendant agreed to not oppose a fee request, where the fee award was analyzed and determined to be reasonable).

### 3.   Whether there is a reversion to Defendant

Finally, the parties did not arrange for unawarded fees to revert to L'Oreal.  Instead, the parties agreed that the gross settlement fund "is all in with no reversion to Defendant."  (Doc. 46-2 at 34, § I(T).). In addition, the parties acknowledged the Court may approve fees that are less than the requested amount, in which case the unawarded fees "will be retained in the Net Settlement Amount for distribution to Participating Class Members."  (Doc. 46-2, amended § III(B)(2).)  Because unawarded fees will be distributed to Class Members, this factor does not support a finding of collusion.

### 4.   Findings on collusion

Based upon the factors set forth by the Ninth Circuit, the Court finds the proposed settlement "appears to be the product of serious, informed, non-collusive negotiations."  *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23 supports final approval of the class settlement.

### C.   Relief provided to the Class

The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688 F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should examine "the complete package taken as a whole," and the proposed settlement is "not to be judged

19

against a hypothetical or speculative measure of what *might* have been achieved by the negotiators." *Officers for Justice*, 688 F.2d at 625, 628.

Plaintiffs report that "with the assistance of a damage expert," they calculated the "damages they believed they would receive if they prevailed." (Doc. 46-1 at 17; *see also* Doc. 46-2 at 11, Blumenthal Decl. ¶ 7(c).) Plaintiffs calculated overtime damages in the amount of $383,622; and meal and rest period damages totaling $511,496. (*Id.*) Plaintiffs report that for the potential statutory penalties, they "calculated that wage statement penalties were a maximum of $598,850 and potential waiting time penalties were $1,215,302." (*Id.*) Class Counsel note they "did not present the valuation of the PAGA claims because these penalty claims are subject to much uncertainty in terms of valuation and are paid primarily to the State of California and not the Class." (Doc. 46-1 at 18; Doc. 46-2 at 11, ¶ 7(c).) Plaintiffs also calculated the damages for the FLSA claim, which was based upon the same facts as the California overtime claims, and found "the FLSA valuation would be a maximum of $287,716." (*Id.* at 18-19.) However, Plaintiffs believe the FLSA damages were "likely less," and contend "this overtime recovery is already subsumed within the valuation of overtime damages in the amount of $383,622." (*Id.* at 18-19.) In total, Plaintiffs identified a maximum total of $2,996,986 in damages and penalties. (*See* Doc. 46-1 at 17-20.) Thus, the gross fund of $425,000 represents approximately 14% of the maximum possible recovery calculated by Plaintiffs.

Notably, the Ninth Circuit observed: "It is well-settled law that a cash settlement amounting to only a fraction of the potential recovery does not per se render the settlement inadequate or unfair." *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d at 459. The recovery in this action is consistent with other approved settlements. *See, e.g., Benitez v. Western Milling, LLC*, 2020 WL 309200, at *8 (E.D. Cal. Jan. 21, 2020) (observing a recovery rate of 13% when PAGA penalties were included was "consistent with percentage recoveries California district courts have found to be reasonable"); *Villegas v. J.P. Morgan Chase & Co.*, 2012 WL 5878390, at *6 (N.D. Cal. Nov. 21, 2012) (finding the gross settlement of approximately 15% of the potential recovery was fair); *see also In re Omnivision Techs.*, Inc., 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2008) (approving a settlement that was "just over 9% of the maximum potential recovery asserted by either party"); *Deaver v. Compass Bank*, 2015 WL 8526982, at *7 (N.D. Cal. Dec. 11, 2015) (finding a settlement that equaled "10.7 percent of the total potential liability

20

1   exposure, before any deductions for fees, costs, or incentive awards" was "fair and reasonable"). Thus,

2   the percentage recovered does not weigh against approval of the Settlement.

3        After the anticipated deductions from the gross fund, the Settlement Administrator expects that

4   $236,024.42 will be dispersed to Participating Class Members.  (Doc. 46-3 at 5, Nava Decl. ¶ 14.)  The

5   Settlement Administrator estimates the average will be $584.59 and the highest payment will be

6   $2,849.49.  (*Id.*)  Analyzing the factors identified in Rule 23—as discussed below—the Court finds the

7   amount offered and relief provided to the Settlement Class supports final approval of the Settlement.

8                    1.      Costs, risks, and delays

9        A "central concern" evaluating a proposed class settlement "relate[s] to the cost and risk

10  involved in pursuing a litigated outcome."  *Feltzs v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9

11  (C.D. Cal. Mar. 2, 2022) (quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modification

12  in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain

13  results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If

14  the Settlement were to be rejected, the parties would have to engage in further litigation, including

15  seeking class certification and discovery on the issue of damages.

16       The parties agreed the claims are "highly disputed."  (Doc. 46-2 at 36, § II(H).)  Plaintiffs

17  acknowledge that "[t]here were complex legal and factual issues that placed the ultimate outcome of

18  this litigation in doubt."  (Doc. 46-1 at 12.)  According to Plaintiffs, "[t]he risks, complexities and

19  duration of further litigation cannot be overstated."  (*Id.* at 22.)  Plaintiffs explain:

20           [A] number of defenses asserted by Defendants presented serious threats to
             the claims of Plaintiffs and the other Class Members.  Defendant contends
21           that Defendant's employment practices complied with all applicable Labor
             laws.  Defendant contended that because the employees worked in pairs,
22           they were able to take legally compliant meal and rest breaks.  Because the
             claims were based upon loss prevention inspections, meal and rest break
23           claims were only applicable to employees who left the mall premises,
             which was infrequent. Defendant also argued that the California Supreme
24           Court decision in *Brinker v. Superior Court*, 53 Cal. 4th 1004 (2012),
             weakened Plaintiffs' claims, on liability, value, and class certifiability.
25           Finally, Defendant asserts defenses to the amount of damages claimed and
             the [imposition] of any penalties.  If successful, Defendant's defenses could
26           eliminate or substantially reduce any recovery to the Class.

27  (Doc. 46-1 at 22.)  Plaintiffs indicate they believe the identified defenses could be overcome, but

28  acknowledge they "present a serious risk to recovery."  (*Id.*)  Further, Plaintiffs recognize "a significant

risk that, if the Action was not settled, [they] would be unable to obtain class certification and maintain a certified class through trial," particularly because "Defendant forcefully opposed the property of class certification" during the mediation process.  (*Id.*)

Employment law class actions are, by their nature, time-consuming and expensive to litigate. *Hightower v. JPMorgan Chase Bank, N.A.*, 2015 WL 9664959 at *6 (C.D. Cal. Aug. 4, 2015).  If the Settlement is rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.  The time and expense of continued litigation could outweigh any additional recovery.  On the other hand, the proposed settlement provides for immediate recovery on claims presented by Plaintiffs on behalf of the class.  Due to the disputed liability, risks to claims of class members, costs of future litigation that may reduce the recovery to class members, and delay in payments if the settlement is not approved, this factor weighs in favor of final approval of the Settlement.  *See Rodriguez*, 563 F.3d at 966 (risk, expense, complexity and duration of litigation supports settlement); *see also Pena v. Taylor Farms Pacific, Inc.*, 2020 WL 6392576, at *8 (E.D. Cal. Nov. 2, 2020) ("settlement avoids the risks, expense and delay of litigation").

### 2.    Method of distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 Newberg on Class Actions § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes.  The proposed method for processing claims "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id*.

Class Members are not required to take any action, such as submitting a claim form, to receive their settlement share.  (Doc. 46-2 at 36-37, § III(A) ["All of the Gross Settlement Amount will be disbursed pursuant to this Agreement without the need to submit a claim form"]; *id.* at 38, § III(C)(1) ["The submission of a claim form is not required to be paid"].)  Rather, Class Members only needed to take action if they wish to opt-out of the settlement, object to any of the terms, or dispute the number

of workweeks identified to calculate their individual settlement share.  Because submission of a claim form is not required, the proposed method of distribution is not "unduly demanding" upon Class Members and will facilitate payment for legitimate claims.  Thus, this factor weighs in favor of final approval of the settlement.  *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D. Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs in favor of a finding that the settlement agreement is fair, reasonable and adequate" where the class members did not have to file a claim).

### 3.    Attorneys' fees

When evaluating the terms of a settlement, "courts must scrutinize 'the terms of any proposed award of attorney's fees.'"  *McKinney-Drobnis v. Oreshack*, 16 F.4th 594, 607 (9th Cir. 2021) (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii).  The Ninth Circuit explained, "the new Rule 23(e) makes clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for the class' in determining whether the settlement is 'adequate' for class members." *Id.*, quoting *Briseño*, 998 F.3d at 1024.

The fees to which the parties agreed are within the range of acceptable fees in the Ninth Circuit, and equal to the benchmark identified by the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  The Court-approved payment shall be made out of the Gross Settlement Amount by the Settlement Administrator within 21 days after receiving the funding from Defendant.  (Doc. 46-2 at 48, § III(E)(9).)  In that same 21-day period, the Settlement Administrator will issue the other approved payments, including to Class Members.  (*Id.*)  Thus, Class Counsel will receive their payment in the same period of time as Class Members.  The amount of fees and the timing of payment do not weigh against final approval of the Class Settlement.

### 4.    Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  Class Counsel reported there are no such agreements requiring identification.  (Doc. 28-2 at 13, Nordrehaug Decl. ¶ 25.)  Thus, this factor does not weigh against preliminary approval.

### D.     Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other." Fed. R. Civ. P. 23(e)(2)(D). "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit." *Hilsley*, 2020 WL 520616 at *7 (citation omitted).

Class Members who did not request exclusion from the Settlement Class will receive a *pro rata* share of the Net Settlement Amount, calculated by:

> (a) dividing the Net Settlement Amount by the total number of workweeks of all Participating Class Members worked during the Class Period to determine the value of each workweek and (b) multiplying the result by each individual Participating Class Member's total number of workweeks worked as a Class Member during the Class Period according to Defendant's records.

(Doc. 46-2 at 39, § III(C)(2).)

Because the Settlement provides *pro rata* distribution to Class Members based upon their number of workweeks, the agreement treats Class Members equitably, and the proposed distribution plan supports preliminary approval. *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (observing a calculation of payments to class members "on a pro-rata basis based on the number of compensable workweeks each member worked … is fair and treats class members equitably"); *Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (approving an agreement including "pro rata allocation based on the number of workweeks the class member performed work during the Class Period"); *see also Martinelli v. Johnson & Johnson*, 2022 WL 4123874, at *6 (E.D. Cal. Sept. 8, 2022) ("the pro rata distribution set forth in the Settlement Agreement [is] equitable").

### E.     Views of Counsel

As addressed above, Class Counsel are experienced in class action litigation. Mr. Blumenthal reports, "Class Counsel believes that the settlement with Defendant for the consideration and on the terms set forth in the Agreement is fair, reasonable, and adequate and is in the best interests of the Class in light of all known facts and circumstances, including the risk of significant delay, the

1   likelihood that Defendant would prevail on its defenses, and numerous potential appellate issues."

2   (Doc. 46-2 at 8, Blumenthal Decl. ¶ 6(e).)  The Settlement also provides: "The Settling Parties and

3   their respective counsel believe and warrant that this Agreement reflects a fair, reasonable, and

4   adequate settlement…."  (Doc. 46-2 at 53, § III(I)(11).)  Thus, both counsel for Plaintiffs and

5   Defendant have indicated a belief that the settlement is fair, reasonable, and adequate.

6         The opinions of counsel are entitled to significant weight and support approval of the

7   Settlement.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the

8   recommendation of counsel, who are most closely acquainted with the facts of the underlying

9   litigation"); *Barbosa v. Cargill Meat Solutions Corp*., 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial

10  court is entitled to, and should, rely upon the judgment of experienced counsel for the parties.").

11        **G.      Reaction of Class Members to the Settlement**

12        "[T]he absence of a large number of objections to a proposed class action settlement raises a

13  strong presumption that the terms of a proposed class action settlement are favorable to the class

14  members."  *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing

15  the court may assess the reaction of class members by considering "how many class members

16  submitted … objections" at the final approval stage).

17        Plaintiffs agreed to the terms of Settlement and executed the agreement.  (*See* Doc. 46-1 at 54-

18  55.)  After receiving the Court-approved Notice, Class Members reacted favorably to the proposed

19  settlement terms by not requesting exclusion or submitting objections.  This "absence of a negative

20  reaction[] strongly supports settlement."  *Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852

21  (N.D. Cal. 2010); *see also Taylor v. Populous Group, LLC*, 2023 WL 139724, at *3 (S.D. Cal. Jan 9,

22  2023) (finding the class members' reaction to the settlement—after notice of the settlement terms and

23  "an opportunity to express their reactions"—supported final approval where no objections to the

24  Settlement were filed); *Manzo v. McDonalds Rests. of Cal., Inc.*, 2022 WL 4586236, at *8 (E.D. Cal.

25  Sept. 29, 2022) ("[t]he lack of any objection weighs in favor of final approval of the settlement").

26  Accordingly, this factor weighs in favor of final approval.

27  **III.     Conclusion**

28        The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval,

25

and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the request for final

approval of the Settlement Agreement is **GRANTED**.

## **APPROVAL OF PAGA SETTLEMENT**

California adopted its Private Attorney General Act "to supplement enforcement actions by

public agencies, which lack adequate resources to bring all such actions themselves." *Arias v. Superior

Court*, 46 Cal. 4th 969, 986 (2009).  PAGA allows individual plaintiffs "to bring a civil action to

collect civil penalties for Labor Code violations previously only available in enforcement actions

initiated by the State's labor law enforcement agencies." *Caliber Bodyworks, Inc. v. Superior Court*,

134 Cal. App. 4th 365, 374 (2005); *see also* Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal.,

Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013).  Thus, a PAGA plaintiff now acts "as the proxy or agent of

the state's labor law enforcement agencies." *Arias*, 46 Cal. 4th at 986.

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor

code violations on behalf of himself and other current or former employees.  Cal. Lab. Code § 2699(a).

PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator

and against whom one or more of the alleged violations was committed." *Id*.  A judgment in a PAGA

action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment

in an action brought by the government." *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the

employer and the Labor and Work Force Development Agency.  Cal. Lab. Code § 2699.3(a)(1).

Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75%

directed to the LWDA and 25% to aggrieved employees.  *Id*. § 2699(i).  Any proposed settlement of

PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any

settlement of PAGA claims. *Id*. § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp*., 383 F.

Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could

otherwise be brought be the state," it requires that a court "review and approve any settlement of any

civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA

settlements, California district courts "have applied a Rule 23-like standard, asking whether the

settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'"  *Haralson*, 383 F. Supp. 3d at 972.  This standard is derived principally from the LWDA itself.  *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016). The LWDA indicated:

> It is thus important that when a PAGA claim is settled, the relief provided for under the PAGA be genuine and meaningful, consistent with the underlying purpose of the statute to benefit the public and, in the context of a class action, the court evaluate whether the settlement meets the standards of being "fundamentally fair, reasonable, and adequate" with reference to the public policies underlying the PAGA.

*Id.* (citation omitted).  When a proposed settlement involves overlapping class action and PAGA claims, courts may employ a "sliding scale" to determine if the proposed settlement is "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the PAGA."  *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following *O'Connor*); *Cooks*, 2020 WL 5535397 at *9-10 (same).  "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently fulfilled."  *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

The proposed Settlement was submitted to the LWDA as required by the Labor Code.  (Doc. 28-6 at 2; Doc. 46-5 at 2.)  No comments from the LWDA were reported by Class Counsel or received by the Court, which supports final approval of the PAGA settlement.  *See Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *8 (E.D. Cal. Apr. 12, 2023) (noting the LWDA did not respond to the submission of the proposed settlement prior to granting final approval of the PAGA settlement); *Moreno v. Capital Bldg. Maint. & Cleaning Servs.*, 2021 WL 1788447, at *8 (N.D. Cal. May 5, 2021) ("The lack of comment from the LWDA weighs in favor of finding that the PAGA settlement is reasonable.").

The settlement fund of $425,000.00 appears sufficiently large—with more than $230,000 expected to be distributed to Class Members—such that the Court finds the purposes of PAGA to address the alleged labor violations are fulfilled by the proposed agreement.  Under the Settlement Agreement, $50,000 of the Gross Settlement Amount is designated as the PAGA payment.  (Doc. 46-2 at 34 § I(X); *see also id.* at 37-38, § III(B)(3).)  The Settlement properly designates 75% of the PAGA

1   funds to the LWDA—a total of $37,500 from the gross fund—and the remaining $25% to aggrieved

2   employees.  (*Id.*)  Accordingly, the Court finds approval of the PAGA payment is also appropriate.  *See*

3   *Mostajo*, 2023 WL 2918657, at *7-8 (finding a $50,000 payment from the gross settlement fund for

4   PAGA claims was fair and adequate, even where it was only 1.3% of the gross fund).

5                                    **REQUEST FOR ATTORNEYS' FEES**

6         Pursuant to the Settlement, Class Counsel may seek attorney's fees in the amount of 25% of the

7   Gross Settlement Amount, or $106,250.  (Doc. 46-2 at 80, amended § III(B)(2).)  Class Counsel assert

8   this amount is "fair and reasonable and should be approved."  (Doc. 45-1 at 9, emphasis omitted.)

9   L'Oreal did not respond to the motion for fees.

10  **I.      Legal Standards[8]**

11        "[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class

12  action settlement agreement."  *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court

13  "may not uncritically accept a fee request," but must review the time billed and assess whether it is

14  reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F.

15  Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5

16  (9th Cir. 1995) (a court may not adopt representations regarding the reasonableness of time expended

17  without independent review); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984)

18  (remanding an action for a thorough inquiry on the fee request when "the district court engaged in the

19  'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining

20  a court should not "accept[] uncritically [the] representations concerning the time expended").

21        The Court has discretion to use either a lodestar or percentage of the common fund calculation

22

23  [8] According to Class Counsel, "in this case involving the enforcement of substantive California state law claims, California
    law under *Laffitte [v. Robert Half International, Inc.*, 1 Cal. 5th 480 (2016)] should also inform the award of fees on those

24  claims."  (Doc. 45-1 at 7-8, citing *Figueroa v. Capital One*, 2021 U.S. Dist. LEXIS 11962, 2021 WL 211551 (S.D. Cal. Jan.
    21, 2021).)  Significantly, in *Figueroa*, the plaintiffs alleged only claims arising under state law.  *See id.*, 2021 WL 211551

25  at *1. The court observed that "[i]n *a diversity action*…federal courts apply state law when determining both the right to
    fees and the method of calculating them."  *Id.*, 2021 WL 211551, at *9 (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043,

26  1047 (9th Circ. 2002) [holding state law governing underlying claims in a diversity action "also governs the award of fees"]
    (emphasis added).  In contrast, here, this Court's *original* jurisdiction under 28 U.S.C. § 1446(d) was invoked by Defendant

27  removing the Second Amended Complaint after Plaintiffs alleged violations of the Fair Labor Standards Act.  (Doc. 1 at 3.)
    Accordingly, the Court evaluates the fee request pursuant to the applicable federal standards.  Nevertheless, the Court notes

28  that state and federal courts use similar tests to evaluate the reasonableness of the fees requested from a settlement fund.
    *Compare Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975) *with Laffitte*, 1 Cal.5th at 489.

to evaluate a fee request.  *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022).  The Ninth Circuit observed that "either method may… have its place in determining what would be reasonable compensation."  *Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989).  Whether the Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate, and reasonable."  *Staton*, 327 F.3d at 963 (quoting Fed.R.Civ.P. 23(e)).

### A.    Lodestar method

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee.  *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc*., 523 F.3d 973, 978 (9th Cir. 2008).  Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[9]

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975); *Quesada v. Thomason*, 850 F.2d 537, 539 (9th Cir. 1988) (indicating the Court should "consider[] some or all twelve relevant criteria set forth in *Kerr*" to determine whether to deviate from the lodestar).

### B.    Percentage from the common fund

As the name suggests, under this method, "the court makes a fee award on the basis of some percentage of the common fund."  *Florida*, 915 F.2d at 545 n. 3.  "The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark."  *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010);

---

[9] The Ninth Circuit has since determined the nature of a fee and the "desirability" of a case are no longer relevant factors. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

1    *see also In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (noting the

2    Ninth Circuit established "[t]he benchmark percentage is 25%" of the common fund).

3          To evaluate whether the requested percentage is reasonable, courts may consider a number of

4    factors, including: (1) the results obtained for the class; (2) the risk undertaken by class counsel,

5    including the complexity of the issues; (3) the length of the professional relationship between class

6    counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check.  *Vizcaino v. Microsoft*

7    *Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904

8    F.2d 1301, 1311 (9th Cir. 1990).  The percentage of the common fund awarded as fees may be adjusted

9    below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Graulty*, 886

10   F.2d at 272; *see also In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011)

11   ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing

12   adequate explanation in the record of any 'special circumstances' justifying a departure").

13        **C.    Fee applicant's burden**

14        Notably, the Court must consider similar factors under both the lodestar method and awarding a

15   percentage of the common fund.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  With

16   either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably

17   necessary to achieve the results obtained.  *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th

18   2000).  Therefore, a fee applicant must provide records documenting the tasks completed and the

19   amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins.*

20   *Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the

21   district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

22   **II.    Evaluation of the Fees Requested**

23        As noted above, Class Counsel contend the attorneys' fee award is reasonable under the

24   common fund doctrine.  (Doc. 45-1 at 11-21.)  Under the "common fund" doctrine, attorneys who

25   create a common fund for a class may be awarded fees from that fund.  *Hanlon*, 150 F.3d at 1029;

26   *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the

27   benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund

28   as a whole").  An award from the common fund "rests on the perception that persons who obtain the

benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf." *Boeing Co.*, 444 U.S. at 478.  Because the Settlement provides for a *pro rata* distribution to Class Members, the Court agrees application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial." *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class.  It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

## A.  Time and labor required

Class Counsel report they "expended more than 260 hours" for work related to this action, through preparation of the motion for fees.[10]  (Doc. 45-1 at 22; *see also* Doc. 45-2 at 87-100, 103-104 [identifying a total of 261.65 hours].)  The billing records for Class Counsel indicate the tasks performed included investigating the claims[11], drafting the pleadings in the action, discovery, mediation, preparation of the long-form settlement agreement, and seeking approval of the settlement. (*See generally* Doc. 45-2 at 87-100, 103-104.)  The time reported and tasks completed appear reasonable for this action.  In addition, Mr. Nordrehaug reports that "to properly handle and prosecute

---

[10] The motion for fees was filed on January 10, 2023, nearly a month before the motion for final approval. Thus, the reported time does not include preparation of the motion for final approval and supporting documents.

[11] Class Counsel report the investigation included: "(a) multiple meetings and conferences with Plaintiffs; (b) inspection and analysis of the documents and materials produced by Plaintiffs and Defendant; (c) analysis of the various legal positions taken and defenses raised by Defendant; (d) investigation regarding potential class treatment of the claims; (e) analysis of potential class-wide damages; (f) research of the applicable law with respect to the claims asserted in the Complaint and the potential defenses thereto; (g) the exchange of information through formal and informal discovery; and, (h) assembling data for calculating damages, including the use of an expert for this calculation."  (Doc. 45-1 at 16.)

[this action], Class Counsel were precluded from taking other cases, and… had to turn away meritorious fee generating cases."  (Doc. 45-2 at 8, Nordrehaug Decl. ¶ 6(d).)  Accordingly, the Court finds this factor would not support an upward departure from the benchmark, but supports an award in the amount requested by Class Counsel.

### B.   Results obtained for the Class

The result achieved for the class is a major factor to be considered in making a fee award. *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir. 1994). The Ninth Circuit observed that "[e]xceptional results are a relevant circumstance" to support an adjustment from the benchmark award.  *Vizcaino*, 290 F.3d at 1048; *see also Resnick v. Frank (In re Online DVD-Rental Antitrust Litigation)*, 779 F.3d 934, 954-55 (9th Cir. 2015) ("the extent to which class counsel achieved exceptional results for the class" is a proper factor for a court evaluating "a request for attorneys' fees that was calculated using the percentage-of-recovery method" [quotation marks, citation omitted].)

Class Counsel assert they "obtained an excellent result in this case for Class Members."  (Doc. 45-1 at 13.)  According to Class Counsel, "[t]here is little question that the result achieved in this litigation is good."  (*Id.*)  In support of this assertion, Class Counsel contend "the settlement of $425,000, before deductions, represents 47% of the value of the damages at issue in this case at the time this settlement was negotiated, assuming these amounts could be proven in full at trial."  (*Id.*) However, as discussed above, when statutory penalties and maximum PAGA penalties are included, the total identified maximum potential recovery was $2,996,986.  (Doc. 46-1 at 17-20; *see also* Doc. 46-2 at 11-12,  Blumenthal Dec. ¶ 7(b)-(c).)  Thus, the gross settlement is approximately 14% of the total maximum recovery, and this result is not exceptional.  *See Atiqui v. Calnet, Inc.*, 2017 WL 11645624, at *7 (C.D. Cal. Aug. 22, 2017) (a settlement that was "10% of the maximum net recovery for class members … would not be so exceptional as to justify a departure from the benchmark").  Indeed, this Court previously indicated the recovery of even 30% of a defendant's maximum liability exposure was not "exceptional."  *See, e.g., Monterrubio*, 291 F.R.D. at 466 (finding "the circumstances of the litigation simply do not lead the Court to conclude that the result is 'exceptional'" where the recovery for the class equaled "30% of Plaintiff's calculation of Defendant's maximum liability exposure"); *see also Ontiveros*, 303 F.R.D. at 373 (expressing doubt that a settlement totaling one-half to one-third of

1   the maximum potential recovery amount was exceptional enough "to justify a departure from the 25%

2   benchmark").  Nevertheless, the results obtained for the class—who will receive immediate monetary

3   relief—support an award equal to the benchmark.  *See Atiqui*, 2017 WL 11645624, at *7.

4   **C.   Risks undertaken by counsel**

5   The risk of costly litigation and trial is an important factor in determining the fee award.

6   *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court

7   explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual

8   merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*,

9   505 U.S. 557, 562 (1992).

10   Class Counsel argue that "the result was far from certain" when the case was filed.  (Doc. 45-1

11   at 14.)  Class Counsel note L'Oreal challenged the bases of the claims and asserted the company's

12   "employment practices complied with all applicable Labor laws."  (Doc. 45-1 at 14.) For example,

13   Class Counsel observe that L'Oreal "contended that because the employees worked in pairs, they were

14   able to take legally compliant meal and rest breaks."  (*Id.*)  To the extent the "claims were based on

15   loss prevention inspections," Class Counsel acknowledge the "meal and rest break claims were only

16   applicable to employees who left the mall premises, which was infrequent."  (*Id.*)  Class Counsel also

17   report that L'Oreal argued, "the California Supreme Court decision in *Brinker v. Superior Court*, 53

18   Cal. 4th 1004 (2012), weakened Plaintiffs' claims, on liability, value, and class certifiability."  (*Id.*)

19   In addition, Class Counsel acknowledge there was "a significant risk" that "Plaintiffs would be

20   unable to obtain class certification and maintain a certified class through trial, and thereby not recover

21   on behalf of any employees other than themselves."  (Doc. 45-1 at 14-15.)  According to Class

22   Counsel, L'Oreal argued that "individual issues precluded class certification" during mediation, and

23   "class certification in this action would have been hotly disputed."  (*Id.* at 15.)  Class Counsel conclude

24   the risks "could have resulted in the Class receiving nothing if the claims were litigated."  (*Id.*)

25   Significantly, the risks identified by Class Counsel to support the fee request—particularly

26   with whether a class may be certified and maintained—are not unique to this action, but rather apply

27   to generally to class action litigation.  Such risks support a fee award equal to the benchmark.  *See*

28   *Vizcaino*, 290 F.3d at 1048; *see also Sebastian v. Sprint/United Mgmt. Co.*, 2019 WL 13037010, at *7

33

1   (C.D. Cal. Dec. 5, 2019) (finding the plaintiff did not identify any risks that "set [the] case apart from

2   other wage-and-hour class actions" and the "recitation of ordinary—average—risks … counsels in

3   favor of approving the fee award at the benchmark"); *Mortley v. Express Pipe & Supply Co.*, 2019 WL

4   13030315, at *5 (C.D. Cal. May 29, 2019) (finding the plaintiff's assertion that "wage and hour class

5   actions are risky because they are hard to certify" was insufficient to support an upward departure

6   from the benchmark, because the plaintiff failed "to show how the risks he faced were significant or

7   unique in relation to other similar class actions").  Accordingly, this factor supports the fees requested.

8           **D.      Financial risk related to contingent fee**

9           Class Counsel contend the fee request is supported by the financial risk undertaken by the firm

10  with "this all or nothing contingent fee case."  (Doc. 45-1 at 17.)  Class Counsel assert that "fees in this

11  case were not only contingent but extremely risky, with a very real chance that Class Counsel would

12  receive nothing at all for their efforts, having devoted time and advanced costs."  (*Id.* at 18.)  Class

13  Counsel argue that attorneys "retained on a contingency fee basis, whether in private matters or in class

14  action litigation, [are] entitled to a premium above their hourly rate in order to compensate for both the

15  risks and the delay in payment."  (*Id.* at 17, citing *Stanger v. China Elec. Motor, Inc*., 812 F.3d 734 (9th

16  Cir. 2016); *Stetson v. Grissom*, 821 F.3d 1157, 1166 (9th Cir. 2016) [emphasis omitted].)

17          Notably, the Ninth Circuit suggested the distinction between a contingency arrangement and a

18  fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth*

19  *Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7 (9th Cir. 2011) ("whether the fee was fixed or

20  contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted); *but see In*

21  *re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (finding the

22  contingent nature of litigation remains a relevant factor to evaluate a request from the common fund).

23  Regardless, risks associated with the contingent nature of the fee support an award equal to the

24  benchmark.  *See Correa v. Zillow, Inc.*, 2021 WL 4925394, at *6 (C.D. Cal. June 14, 2021) (standing

25  alone, "the attorneys' contingent risk… does not justify an upward departure of the benchmark");

26  *Clayton v. Knight Transp*., 2013 WL 5877213, at *8 (E.D. Cal. Oct. 30, 2013) (acknowledging the

27  contingent nature was "an important factor," but finding an award equal to the benchmark was

28  appropriate where "the risks associated with this case are no greater than [those] associated with any

other wage and hour action"). Therefore, this factor supports granting the fees requested.

### E.     Complexity of issues and skill required

The complexity of issues and skills required may support a departure from the benchmark fee award. *See In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in adjusting a fee from the benchmark based upon "the complexity of the issues and the risks"); *see also Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award" [citation omitted]).

Class Counsel assert that "[t]he issues presented in this case required more than just a general appreciation of wage and hour law and class action procedure." (Doc. 45-1 at 15.) Class Counsel contend, "this area of practice is still developing as evidenced by the California Supreme Court's ruling in *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th 1004 (2012) and the Ninth Circuit's ruling in *Sakkab v. Luxottica Retail N. Am., Inc*., 803 F.3d 425 (9th Cir. 2015), in which Class Counsel was personally involved as the prevailing counsel." (*Id.*) According to Class Counsel, their "work and skill resulted in [the] early settlement." (*Id.* at 15.)

Importantly, Class Counsel do not identify any particular complex issues faced in *this* matter. On the other hand, the experience and skill of Class Counsel undoubtedly benefited Plaintiffs and Class Members, as the parties reached an initial agreement with mediation approximately 14 months after the action was filed. Class Counsel report they investigated the claims by meeting with Plaintiffs, reviewing "documents and materials produced by Plaintiffs and Defendant," and retained an expert to analyze the class data. (Doc. 45-1 at 16.) Based upon the information provided, Class Counsel displayed skills consistent of those that would be expected of attorneys of comparable experience. Thus, this factor supports the requested fee award.

### F.     Length of the professional relationship

Class Counsel initiated this action on behalf of Plaintiffs in 2018, and it appears the professional relationship has lasted approximately five years. The short duration of the professional relationship may warrant an award below the benchmark. *See Six Mexican Workers*, 904 F.2d at 1311 (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

### G.     Awards in other cases

Class Counsel assert the amount awarded in similar cases supports their fee request.[12]  (Doc. 45-1 at 18-21.)  Notably, as discussed above, 25% of a common fund is the "benchmark award for attorney fees" in the Ninth Circuit. *Hanlon*, 150 F.3d at 1029; *see also Vizcaino*, 290 F.3d at 1047.  Thus, the amount requested by Class Counsel is equal to the benchmark, which supports a determination that the percentage requested is reasonable.  *See id.*

### H.     Lodestar crosscheck and market rate

As noted above, the Court may perform a lodestar crosscheck to evaluate whether the fees requested from a common fund are reasonable.  *Indirect Purchaser Class v. Erwin (In re Optical Disk Drive Prods. Antitrust Litig.*), 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable"); *see also In re Apple Device Performance Litig.*, 50 F.4th 769, 786 (9th Cir. 2022) (also encouraging a crosscheck "when utilizing the percentage-of-recovery method").  The lodestar is calculated by multiplying the time "reasonably expended" by counsel by "a reasonable hourly rate."  *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433).

#### 1.     Time expended

In general, the first step in determining the lodestar is to determine whether the number of

---

[12] In support of this assertion, Class Counsel observe that "[i]n similar federal actions involving wage and hour class actions, … fee requests of 30% or more are routinely awarded."  (Doc. 45-1 at 19, citing *Cicero v. DirectTV, Inc.*, 2010 U.S. Dist. LEXIS 86920 at *16-18; *Knight v. Red Door Salons, Inc*., 2009 U.S. Dist. LEXIS 11149, *17 (N.D. Cal. 2009) ["'nearly all common fund awards range around 30%'"]); *Sevilla v. Aaron's, Inc*., 2020 U.S. Dist. LEXIS 86994, *5 (C.D. Cal. 2020) [awarding one-third fee]; *Wright v. Renzenberger, Inc*., 2020 U.S. Dist. LEXIS 184673, *16-19 (C.D. Cal. 2020) [finding one-third fee to be reasonable under *Laffitte*]; *Ingalls v. Hallmark Mktg. Corp.*, 2009 U.S. Dist. LEXIS 131078 (C.D. Cal. 2009) [awarding 33.33% fee on a $ 5.6 million wage and hour class action]; *Birch v. Office Depot, Inc*., 2007 U.S. Dist. LEXIS 102747 (S.D. Cal. 2007) [awarding a 40% fee on a $ 16 million wage and hour class action]; *Rippee v. Boston Mkt. Corp*., 2006 U.S. Dist. LEXIS 101136 (S.D. Cal. 2006) [awarding a 40% fee on a $3.75 million wage and hour class action]; *Stuart v. Radioshack Corp*., 2010 U.S. Dist. LEXIS 92067, *15-18 (N.D. Cal. 2010) [awarding attorneys' fees amounting to one-third of a $4.5 million settlement in a Section 2802 inter-storing class action]; *Bond v. Ferguson Enterprises, Inc*., 2011 U.S. Dist. LEXIS 70390, *28-29, 36 (E.D. Cal. 2011) [awarding attorney's fees amounting to 30% of a $2.25 million settlement in a meal break class action, and concluding "Plaintiff's request for a multiplier of 1.75 of its lodestar is reasonable."]; *Romero v. Producers Dairy Foods, Inc.*, 2007 U.S. Dist. LEXIS 86270, *4, 10 (E.D. Cal. 2007) [awarding 33% of common fund].)  Significantly, however, Class Counsel do not provide *any* analysis as to how these cases were similar to the matter now pending.  For example, Class Counsel have not provided any information regarding the claims raised or hours expended by counsel in these actions.  The Court declines to manufacture arguments on behalf of Class Counsel regarding the similarities.  Moreover, the limited parenthetical information provided by Class Counsel indicates that most of the cited actions included significantly larger settlements than achieved in this action.

hours expended was reasonable. *Fischer*, 214 F.3d at 1119.  When the lodestar is used as a crosscheck for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *See Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted).  However, the Court has the discretion to review submitted time sheets to determine whether the time expended was reasonable. *See In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district court acted within its discretion in reducing the lodestar for unnecessary and duplicative work)

The Court has reviewed the billing records provided by Class Counsel.  The reported 261.65 hours included: preparation of the pleadings; communications with Plaintiffs, opposing counsel, and expert regarding class data; discovery; mediation; and preparation of the motions for preliminary approval and the motion for fees.  (*See generally* Doc. 45-2 at 87-100, 103-104.)  Review of the time sheets confirms Class Counsel did not overbill or perform unnecessary tasks.  Consequently, the Court finds the time expended was reasonable and no adjustments will be made.

### 2.   Hourly rates

Next, the Court must determine whether the hourly rates are reasonable to calculate the lodestar. *See Florida*, 915 F.2d at 545 n.3.  The Supreme Court explained attorney fees are to be calculated with "the prevailing market rates in the relevant community." *Blum v. Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of determining the prevailing market rate is the "forum in which the district court sits." *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is filed in the Eastern District of California, this District "is the appropriate forum to establish the lodestar hourly rate…" *See Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

Fee applicants bear a burden to establish that the requested rates are commensurate "with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Blum*, 465 U.S. at 895 n.11.  Applicants meet this burden by producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1110-

11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding prevailing fees in the community … are satisfactory evidence of the prevailing market rate.").  The Court may apply "rates from outside the forum ... 'if local counsel was unavailable, either because they are unwilling or unable to perform because they lack the degree of experience, expertise, or specialization required to handle properly the case.'"  *Barjon v. Dalton*, 132 F.3d 496 (9th Cir. 1997) (quoting *Gates v. Deukmejian*, 987 F.2d 1392, 1405 (9th Cir. 1992)).  Because Plaintiffs do not report that local counsel was unavailable, the Court must determine whether the hourly rates applied by Class Counsel to calculate their lodestar align with those in the Eastern District.

### a.    Experience of counsel and staff

Mr. Nordrehaug provided a "firm resume" for attorneys at Blumenthal Nordrehaug Bhowmik De Blouw LLP.  (Doc. 45-2 at 2, ¶ 2(a); Decl. Exh. 1.)  Mr. Nordrehaug was admitted to the California bar in 1999, and his practice areas also include consumer and securities class actions, wage and hour class actions, and civil litigation.  (Doc. 45-2 at 20.)  Mr. Nordrehaug has received the following awards: "Top Labor & Employment Attorney 2016; Top Appellate Reversal - Daily Journal 2015; [and] Super Lawyer 2015-2018." (*Id.*)  Norman Blumenthal was admitted to practice in Illinois is 1973 and in California in 1976; he practices in the areas of consumer and securities class action, civil litigation, wage and hour class actions, and transactional law.  (*Id.*)  Aparajit Bohmik was admitted to the California bar in 2006, and received the "Rising Star 2015" award.  (*Id.*)  Nicholas De Blouw, Jeffrey Herman, and Victoria Rivapalacio were each admitted in 2011; and Piya Mukherjee was admitted in 2010.  (*Id.* at 21.)  Charlotte James and Rico Ehmann were admitted in 2016 and 2018, respectively, and both are practicing wage and hour class actions.  (*Id.*)  No information is provided regarding the education and experience of Heather Drosi and Karla Horne, the paralegals who worked on this action.  (*See* Doc. 45-2 at 14, *id.* at 20-35.)

### b.    Rates applied by counsel

Mr. Nordrehaug reports, "The hourly rates for staff at Blumenthal Nordrehaug Bhowmik De Blouw LLP are as follows: Partner Attorneys from $695 to $795, Associate Attorneys from $325 to $550, Paralegals from $250 to $275."  (Doc. 45-2 at 14, Decl. ¶ 8.)  Mr. Nordrehaug contends, "[t]he rates charged by [the] firm are in line with the prevailing rates of attorneys in the local legal community

1   for similar work and, if this were a commercial matter, these are the charges that would be made and

2   presented to the client." (*Id.*)  According to Mr. Nordrehaug, "[t]hese hourly rates have been approved

3   by Court's (sic) throughout California, including the Courts in the Superior Court of California." (*Id.*)

4   Mr. Nordrehaug observes:

> [O]n August 1, 2018, in *Taylor v. TIC - The Industrial Company*, USDC
> Case No. 5:16-cv-00186, District Judge Andre Birotte Jr. explicitly found
> that Class Counsel's "rates generally appear reasonable and 'in line with
> those prevailing in the [relevant] community'—the Central District of
> California". These rates were also approved by Courts in *Calhoun v.
> Celadon Trucking* (U.S.D.C. Central District of California Case No. 16-
> CV-1351), *Metrow v. Liberty Mutual*, (U.S.D.C. Central District of
> California Case No. EDCV 16-01133-JGB), *Panda Express Wage and
> Hour Cases* (Los Angeles Superior Court, Case No. JCCP 4919), and
> *Solarcity Wage and Hour Cases* (San Mateo Superior Court, Case No.
> JCCP 4945).

11   (*Id.*)  Furthermore, he asserts that "them reasonableness of my firm's hourly rates is further confirmed

12   by comparing such rates with the rates of comparable counsel practicing complex and class litigation

13   as detailed in the National Law Journal Billing Survey." (*Id.*, citing *Zest IP Holdings, LLC v. Implant

14   Direct MFG., LLC*, 2014 U.S. Dist. LEXIS 167563 (S.D. Cal. 2014).)  Mr. Nordrehaug notes that in

15   *Zest*, the Southern District found "Mayer Brown's $775 average billing rate for partners' and 'Mayer

16   Brown's $543 average associate billing rate' [were] reasonable rates when compared within 21other

17   firms practicing in the Southern District of California." (*Id.*)

18           Significantly, Mr. Nordrehaug identifies only actions from other forums to support the

19   assertion that the Court should adopt the hourly rates.  However, the matter is now pending in the

20   Eastern District, and the identified actions from the federal and state courts outside the Eastern District

21   do not assist this Court.  Likewise, Class Counsel have offered no evidence that the National Law

22   Journal rates are aligned with the market rates in this forum for attorneys of comparable experience

23   and skill.  Thus, the Court declines to rely upon the National Law Journal.

24                   *c.       Adjustments to rates for counsel*

25           This Court has performed a comprehensive survey of fees awarded in the Eastern District, and

26   finds current hourly rates range from $200 to $750, with hourly rates exceeding $600 reserved for

27   attorneys who have been practicing approximately 30 years.  *See, e.g., Cianchetta v. BMW of N. Am.,

28   LLC*, 2022 WL 2160556, at *6 (E.D. Cal. June 13, 2022) (reducing the hourly rate for attorneys in their

first year of practice to $200); *Seebach v. BMW of N. Am.*, 2020 WL 4923664 at *3 (E.D. Cal. Aug. 21, 2020) (awarding the hourly rates of $200 for an attorney who had been admitted to practice less than two years, and $505 for an attorney "with roughly 20 years of experience" in 2020); *Aoki v. Gilbert*, 2022 WL 956949, at *2 (E.D. Cal. May 29, 2022) (observing the Court found "450 an hour [was] a reasonable rate for an attorney with fifteen years of experience" [citation omitted]); *Siafarikas v. Mercedez- Benz USA, LLC*,  2022 WL 16926265, at *3 (E.D. Cal. Nov. 10, 2022) (approving the rate of $250 for an attorney "who has practiced law for three years" and $500 for an attorney who practiced law for 21 years); *Garybo v. Leonardo Bros*, 2021 WL 449350, at *5 (E.D. Cal. Sept. 30, 2021) (adopting the hourly rate of $500 for attorneys who were admitted to practice for 20 years or more to calculate a lodestar); *Mostajo v. Nationwide Mut. Ins. Co.*, 2023 WL 2918657, at *11 (E.D. Cal. Apr. 12, 2023) (approving of "hourly rates ranging from $650 through $750" for "attorneys with over thirty years of experience" for purposes of calculating a lodestar).  With these parameters in mind, the hourly rates for counsel must be adjusted to those of the local forum.

The rate for Mr. Blumenthal, who has been practicing approximately 50 years, is adjusted to $750.  The time for Mr. Nordrehaug, who has been practicing approximately 24 years, will be calculated at the rate of $525.  The rate for Aparajit Bohmik, who has been practicing law for 17 years, is adjusted to $475. The rates for those who have been practicing between 12 and 13 years—including Piya Mukherjee, Nick De Blouw, Victoria Rivapalacio, and Jeff Herman—are adjusted to $450.  For Charlotte James, who has been practicing law for approximately 7 years, the hourly rate of $375 is applied.  Finally, the rate for Rico Ehmann, who has been practicing law for approximately five years, is adjusted to $300.

### d.      Adjustments to rates for paralegals

Paralegal rates within the Eastern District range from $75 to approximately $150.00 per hour, depending on experience.  *See, e.g., Schmidt v. City of Modesto*, 2018 WL 6593362, at *6 (E.D. Cal. Dec. 14, 2018) ("the reasonable rate of compensation for a paralegal would be between $75.00 to $150.00 per hour depending on experience"); *Bernal v. Sacramento Cty. Sheriff Dep't,* 2023 WL 2504895, at *5 (E.D. Cal. Mar. 14, 2023) (rates of "approximately $100 per hour" were reasonable for paralegals in this district); *Gilbert v. Jabar Wireless Inc.*, 2023 WL 3055108, at *9 (E.D. Cal. Apr. 24,

2023) (finding the hourly rate of $115 was reasonable for "experienced paralegals"); *Block v. Narwal*, 2022 WL 17455502, at *9 (E.D. Cal. Dec. 6, 2022) (finding the requested rate of $115 was reasonable for paralegals who had more than ten years of experience); *Freshko Produce Servs. v. ILA Prods,* 2021 WL 4033176, at *4 (E.D. Cal. Sept. 2, 2021) (finding $150 per hour was reasonable "for a paralegal with more than 30 years of experience" for calculating a lodestar).

When counsel failed to provide information related to the experience of paralegals, the Court has reduced the requested fee award to the lower end of the hourly rate range. *See, e.g., Englert v. City of Merced*, 2020 WL 2215749, at *13 (E.D. Cal. May 7, 2020) (rejecting the requested rates of $125 to $150 per hour for the paralegals and reducing them to $75 when the plaintiffs "provided no information on the experience of the paralegals"); *Freshko Produce Servs. v. Write on Mktg*., 2019 WL 3798491 at *3 (E.D. Cal. Aug. 13, 2019) (finding the proposed hourly rate of $150 was not reasonable because counsel "fail[ed] to identify the education and experience of [the] paralegal to justify the upper rate of $150," and adjusting the hourly rate to $100); *Mora v. Cal W. Ag Servs., Inc*., 2019 WL 2084725, at *9 (E.D. Cal. May 13, 2019) (applying adjusted rate for paralegals of $100 per hour where counsel failed to identify the experience of the paralegals). Because Class Counsel did not provide any information regarding the education and experience of paralegals who worked on this action, the hourly rate for each paralegal will be reduced to $100. *See Freshko Produce*, 2019 WL 3798491 at *3; *Mora*, 2019 WL 2084725, at *9.

### 3. Calculation and cross-check

Based upon the survey of fees awarded in the Eastern District and the Court's own knowledge, these adjusted rates are reasonable and align with prevailing local market rates. *See Cianchetta*, 2022 WL 2160556, at *6; *Garybo*, 2021 WL 449350, at *5; *see also Ingram v. Oroudjian,* 647 F.3d 925, 928 (9th Cir. 2011) (concluding "the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates). With the hourly rates set forth above, the adjusted lodestar totals $124,835.00.

| Counsel | Time | Rate | Lodestar |
|---|---|---|---|
| Aparajit Bhowmik | 37.00 | $475 | $17,575.00 |
| Charlotte James | 9.00 | $375 | $3,375.00 |
| Heather Drosi | 0.20 | $100 | $20.00 |
| Jeff Herman | 3.30 | $450 | $1,485.00 |

| Karla Horne | 1.10 | $100 | $110.00 |
|---|---|---|---|
| Kyle Nordrehaug | 74.80 | $525 | $39,270.00 |
| Norman Blumenthal | 19.25 | $750 | $14,437.50 |
| Nick De Blouw | 54.00 | $450 | $24,300.00 |
| Piya Mukherjee | 12.05 | $450 | $5,422.50 |
| Ricardo Ehmann | 27.25 | $300 | $8,175.00 |
| Victoria Rivapalacio | 23.70 | $450 | $10,665.00 |
| *Total* | | | **$124,835.00** |

Even with the downward adjustment to the hourly rates, the lodestar exceeds the amount of fees now requested by Class Counsel.  Consequently, the lodestar cross-check supports a conclusion that the fees requested are reasonable.  *See Gonzalez*, 729 F.3d at 1202.

### III.    Conclusion

The factors set forth above weigh in favor of granting the fees requested, totaling one quarter of the gross settlement fund.  Moreover, the lodestar—which is a presumptively reasonable amount—supports the benchmark award.  The fees requested are fair, adequate, and reasonable as required under Rule 23.  Therefore, the request for fees is **GRANTED** in the amount of **$106,250.00**.

### REQUESTS FOR COSTS

### I.    Litigation Expenses

"There is no doubt that an attorney who has created a common fund for the benefit of the class is entitled to reimbursement of reasonable litigation expenses from that fund." *Ontiveros v. Zamora*, 303 F.R.D. 356, 375 (E.D. Cal. 2014) (citation omitted).  Generally, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).  In addition, costs may be awarded under California law to an employee who prevails on a PAGA claim.  *See* Cal. Lab. Code § 2699(g).

The Settlement provides that Class Counsel may seek "an amount not more than $12,000 for all expenses incurred as documented in Class Counsel's billing records as their Class Counsel Litigation Expenses Payment."  (Doc. 46-2 at 81, amended § III(B)(2).)  Pursuant to this provision, Class Counsel now request $12,000.00 in costs.  (Doc. 45-1 at 23, citing § III(B)(2).)  The advanced costs identified by Class Counsel total $13,791.70, which includes fees for filing, mediation, legal research, and the

expert fees.  (Doc. 45-2 at 100-101.)  Previously, this Court observed that costs "including filing fees, mediator fees …, copy charges, computer research, and database expert fees … are routinely reimbursed" in class action cases.  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011); *see also Ontiveros*, 303 F.R.D. at 375 (finding costs including to mediation, court fees, research, and expert fees were "reasonable litigation fees" and approving class counsel's request for costs).  Because the costs requested are reasonable and the type routinely approved, the request for litigation expenses is **GRANTED** in the amount of **$12,000.00**.

## II.      Costs of Settlement Administration

The parties agreed the Settlement Administrator shall receive a payment from the gross settlement fund for its duties, including:

> preparing, printing, and mailing the Class Notice Packet to all Class Members; conducting a National Change of Address search on any Class Notice Packet returned by the U.S. Postal Service as non-deliverable, and re-mailing the Class Notice Packet to the Class Member's new address; setting up a toll-free telephone number to receive calls from Class Members; receiving and reviewing for validity completed Elections Not to Participate in Settlement; providing the Settling Parties with weekly status reports about the delivery of Class Notice Packets and receipt of completed Elections Not to Participate in Settlement; calculating Settlement Shares and PAGA Payment Shares; issuing the checks to effectuate the payments due under the Settlement; issuing the tax reports required under this Settlement; remitting unclaimed settlement proceeds to the California Unclaimed Property Fund, providing all required reports and declarations in support of proceedings to approve and effectuate this settlement through the District Court, and otherwise administering the Settlement pursuant to this Agreement.

(Doc. 46-2 at 39-40, § III(D).)  Ms. Nava reports that "ILYM Group's total fees and costs for services in connection with the administration of this Settlement, which includes fees and costs incurred to-date, as well as anticipated fees and costs for completion of the settlement administration, are $10,725.58." (Doc. 46-3 at 5, Decl. ¶ 15.)  Notably, the Court previously authorized settlement administration costs up to $15,000.  (Doc. 41 at 28, ¶ 12.)

Based upon the information provided regarding the tasks performed by the Settlement Administrator— and the continuing responsibilities with the calculation of the settlement shares, issuance and mailing of those settlement payments, and any necessary tax reporting on such payments—the Court finds the requested Settlement Administration costs are reasonable.  Therefore, a

1    payment of $10,725.58 for the Settlement Administrator from the gross fund is **APPROVED**.

2    <u>**CLASS REPRESENTATIVE PAYMENT**</u>

3     A class representative may "receive a share of class recovery above and beyond [his] individual

4    claim" with a service payment, also known as an "incentive payment."  *China Agritech, Inc. v. Resh*,

5    138 S.Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for

6    reasonable incentive payments").  However, incentive payments for class representatives are *not* to be

7    given routinely.  The Ninth Circuit observed: "[i]f class representatives expect routinely to receive

8    special awards in addition to their share of the recovery, they may be tempted to accept suboptimal

9    settlements at the expense of the class members whose interests they are appointed to guard."  *Staton*,

10   327 F.3d at 975 (citations omitted).

11   **I.** <u>**Awarding a Service Payment**</u>

12    The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all

13   incentive awards."  *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013).  In

14   evaluating a request for a service payment to a class representative, the Court must consider: "'the

15   actions the plaintiff has taken to protect the interests of the class, the degree to which the class has

16   benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the

17   litigation,' and any financial or reputational risks the plaintiff faced."  *Named Plaintiffs & Settlement*

18   *Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir.

19   2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton*

20   327 F.3d at 977.  Further, payments may recognize a plaintiff's "willingness to act as a private attorney

21   general."  *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

22    The Settlement provides that Plaintiffs may each "apply to the District Court for a Class

23   Representative Service Payment of not more than $5,000" from the Gross Settlement Amount.  (Doc.

24   46-2 at 79, amended § III(B)(1).)  Accordingly, Plaintiffs now request the Court approve service

25   payments of $5,000 to each named plaintiff.  (Doc. 36-1 at 22.)

26    **A.** **Time expended**

27    The Eastern District has awarded service payments for "substantial efforts taken as a class

28   representative when the plaintiff has undertaken at least 30 to 40 hours of work."  *Greer v. Dick's*

*Sporting Goods, Inc.*, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks, citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.,* 2017 WL 749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments when each plaintiff reported "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit" [modification adopted]).  Conti and Mora each estimate they spent "between 70 and 80 hours working on this case." (Doc. 28-3 at 5, Conti Decl. ¶ 11; Doc. 28-4 at 5, Mora Decl. ¶ 11.)  This amount of time weighs in favor of issuing service payments.

### B.   Actions taken to benefit the class

Plaintiffs assert they each "had several conversations with [their] attorneys at the law firm of Blumenthal Nordrehaug Bhowmik De Blouw LLP" prior to agreement be class representatives. (Doc. 28-3 at 4, Conti Decl. ¶ 6; Doc. 28-4 at 4, Mora Decl. ¶ 6.)  Plaintiffs report they discussed "Defendant's company policies and how those policies were applied;" and "spent considerable time gathering documents, providing information and answering questions so that [the] attorneys could analyze everything … provided to them and assess the strength of [the] claims." (*Id.*)  Plaintiffs state they "stayed in touch with [their] attorneys by phone and email on a regular basis." (Doc. 28-3 at 4-5, Conti Decl. ¶ 9; Doc. 38-4 at 4-5, Mora Decl. ¶ 9.)  In addition, Plaintiffs report Class Counsel provided "access to a website that included all major filings in the case and [they] would review those documents from time to time to keep up with all significant developments in the lawsuit." (Doc. 28-3 at 5, Conti Decl. ¶ 9; Doc. 38-4 at 5, Mora Decl. ¶ 9.)  Although neither Conti nor Mora attended the mediation, both were "available by telephone" and report they spoke to Class Counsel "regarding the terms of the settlement which was reached between the parties." (Doc. 28-3 at 5, Conti Dec. ¶ 10; Doc. 28-4 at 5, Mora Decl. ¶ 10.)

Notably, Plaintiffs likely would have taken many of these actions even if proceeding with individual claims.  On the other hand, by providing information to Class Counsel and assisting with discovery, their actions undoubtedly benefitted Class Members, who will receive an average payment of $584.59, and up to $2,849.49.  (Doc. 46-3 at 5, Nava Decl. ¶ 14.)  Accordingly, the actions taken on behalf of the class support service payments to Plaintiffs.

*///*

### C.    Workplace retaliation

The Court may consider whether the named plaintiff has "reasonable fears of workplace retaliation" in evaluating a request for a service payment.  *Staton*, 327 F.3d at 977.  However, this Court observed previously that when class representatives are former employees—as here—retaliation by the defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014).  Because Plaintiffs cannot suffer workplace retaliation from L'Oreal, this factor does not support a service payment.

### D.    Reputational risk

Plaintiffs contend they "risked being 'blacklisted' by future employers for having sued Defendant in a class action."  (Doc. 45-1 at 24.)  Specifically, Plaintiffs each assert: "I knew there was a risk that future employers might look negatively on the fact that I sued my prior employer."  (Doc. 28-3 at 4, Conti Decl. ¶ 7; Doc. 28-4 at 4, Mora Decl. ¶ 7.)  Notably, if Plaintiff elected file individual claims rather than a class action, their names also would have been on the complaint as the plaintiffs. Regardless, any difficulty obtaining future employment due to Plaintiffs' status as a named class representative lacks evidentiary support and is speculative.  The Ninth Circuit observed: "the trial court is not bound to, and should not, accept conclusory statements about 'potential stigma' and 'potential risk,' in the absence of supporting evidence."  *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020) (quoting *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805 (2009)).  Thus, the Ninth Circuit determined a court did not abuse its discretion in reducing a requested class representative payment from $10,000 to $5,000 based on the speculative "risk of reputational injury." *Id.*  Accordingly, this factor does not support the requested service payments.

### E.    Financial risk

Plaintiffs observe they "assumed the risk… that they might possibly be liable for costs incurred in connection with this case, which would have far exceeded the requested awards."  (Doc. 45-1 at 25.) Courts in the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive payment to a class representative.  *See, e.g., Vasquez,*  266 F.R.D. at 491 ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of Defendant in this action, they could have been personally responsible for any costs awarded in favor of Defendant"); *Wilson v. Metals*

46

*USA, Inc.*, 2021 WL 516585, at *9 (E.D. Cal. Feb. 11, 2021) (noting the plaintiffs asserted that "by initiating this case, they assumed the risk of a judgment against them and personal liability for an award of costs to defendant in the event of an adverse outcome, and finding the identified financial risk "weighs in favor of granting an incentive award"); *Jones v. Abercrombie & Fitch Trading Co*., 2018 U.S. Dist. LEXIS 198001, at *26 (C.D. Cal. Nov. 19, 2018) (considering the named plaintiffs "assumed financial risk for paying costs if the case had been lost" in awarding service payments; *Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120, at *7 (N.D. Cal. Sept. 26, 2013) ("the Class Representatives undertook a financial risk that, in the event of a judgment in favor of Defendant, they may have been personally responsible for any costs awarded in favor of Defendant"). Thus, this factor supports service payments to Plaintiffs.

### F.     Willingness to act as private attorney general

The Ninth Circuit observed that incentive payments may recognize a named plaintiff's "willingness to act as a private attorney general." *Rodriguez*, 563 F.3d at 958-59. Here, Plaintiffs acted as private attorney generals, which will result in payments to the LWDA and aggrieved employees under PAGA. (*See* Doc. 46-2 at 37-38, § III(B)(3).) Accordingly, this factor supports the requested service payments.

## II.     Reasonableness of Plaintiff's request

Considering the factors set forth above—including the actions taken by Plaintiffs on behalf of the class, the time expended, benefit received, financial risk undertaken and willingness to serve as a private attorney general—service awards are appropriate. In determining the amount to be awarded, the Court may consider the actions undertaken by the class representative, the fairness of the hourly rate, and how large the incentive award is compared to the average award class members expect to receive. *See, e.g., Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v. Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award requested was "reasonably close to the average per class member amount to be received); *Alvarado*, 2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff). Notably, a service payment of $5,000 for the class representative "is presumptively

reasonable" in the Ninth Circuit. *Richardson v. THD At-Home Servs.*, 2016 WL 1366952, at *13 (E.D. Cal. Apr. 6, 2016); *see also Gonzalez v. NCI Group, Inc.*, 2023 WL 373252, at *9 (E.D. Cal. Jan. 24, 2023) ("Courts routinely find rewards in the amount of $5,000 to be reasonable"); *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in the Northern District, "a $5,000 payment is presumptively reasonable").

### A.   Actions of the class representative

In *Rankin*, this Court approved a service payment of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation." *Id.*, 2011 2011 WL 13239039, at *5. Similarly, the Northern District Court determined an incentive award of $5,000 was appropriate for a class representative "was the one who initially brought the matter to counsel's attention," participated in discovery and settlement negotiations, and "spent more than 40 hours on [the] case." *Chen v. Chase Bank USA, N.A.*, 2020 WL 3432644, at *12 (N.D. Cal. June 30, 2020). The actions of Plaintiffs—who report assisting with discovery, being available by phone during the mediation, and speaking to Class Counsel regarding the terms of the settlement —are similar to those taken in *Rankin* and *Chen*. Therefore, this factor supports a conclusion that the service payments requested by Plaintiffs are fair and reasonable.

### B.   Fairness of the hourly rate

Previously, courts have considered the hourly rate of compensation for a class representative. *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable. *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15.

For example, this Court criticized a requested award that would have compensated the class representative "at a rate of $73.80 per hour." *Ontiveros*, 303 F.R.D. at 366. Evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the defendant. *Id.* at 366, n.3. The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk … for example, for time they could

have spent at their jobs." *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded the $13,500 total up to $15,000 to "incorporate[] an extra incentive to participate in litigation." *Id.*

Similarly, the Central District declined to approve service payments to the class representatives where the proposed amount resulted in "extremely high hourly rates." *Moss*, 2018 WL 5099291, at *11.  The court observed the requested award of $25,000 for each of the class representatives, Moss and Watkins, was "the equivalent of a payment of approximately $210 per hour to Moss and $470 per hour to Watkins." *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to each class representative. *Id.*

Plaintiffs did not provide any information concerning their rates of pay while employees of L'Oreal.  (*See generally* Docs. 28-3, 28-4.)  The requested service payment to Plaintiffs—based upon the estimated 70 to 80 hours they spent on the matter—would result in an hourly rate of about $63 to $72.  This hourly rate appears higher than is reasonable.  *See Ontiveros*, 303 F.R.D. at 366; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15 (reducing the service awards for each class representative).  If the Court were to adopt the $50 hourly rate approved in *Ontiveros*, the service payments for Plaintiffs would be reduced to a maximum of $4,000.  Thus, the hourly rates do not support service payments in the amount requested.

## C.   Comparison of the award to those of the Class Members

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental Antitrust Litig.,* 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016); *Emmons,* 2017 WL 749018 at *9 (E.D. Cal. Feb. 27, 2017) (awarding class representative payments of $8,000, 14.5 times the average award and 0.3% of the gross settlement of $2.35 million); *Patel v. Trans Union, LLC,* 2018 WL 1258194, *3, 7-8 (N.D. Cal. Mar. 11, 2018) (awarding enhancement payment of $10,000, which was 25 times the average award and 0.125 % of the gross settlement).  For example, in *Rankin*, the Court found a service award of $5,000 was reasonable, observing "the sum is reasonably close to the average per class member amount to be received." *Id.*, 2011 WL 13239039, at *2.

The requested awards for Plaintiffs are approximately 8.5 times the average award of $584.59. (*See* Doc. 46-2 at 5, Nava Decl. ¶ 14.)  In addition, each award is approximately 1.2% of the gross settlement fund, which is comparable to other service payments approved by this Court.  *See, e.g., Vasquez*, 266 F.R.D at 490-491 (class representatives received service payments of $5,000 out of a gross settlement fund of $300,000); *Ahmed v. Beverly Health & Rehab. Servs.*, 2018 WL 1941674 (E.D. Cal. Apr. 24, 2018) (approving a requested service award of $4,500 from a settlement of $450,000, which was 1% of the gross fund).  Therefore, this factor supports service payments in the amount requested.

**III.    Amount Awarded**

Because the factors discussed above support an incentive award— and the actions of Plaintiffs clearly benefited Class Members—a service payment is appropriate.  As noted above, the application of a $50 hourly rate to the maximum time estimated by Plaintiffs would result in a service payment of $4,000.  On the other hand, Plaintiffs released all other potential claims related to their employment with L'Oreal.  (*See* Doc. 46-2 at 49, § III(F)(2))  This Court indicated that a plaintiff sacrificing "the opportunity to bring several of his own claims" supported an increase to a service payment.  *See Ontiveros*, 303 F.R.D. at 366.

The requested service payments of $5,000 for both Conti and Mora are appropriate in light of the time expended, tasks taken, benefit to the class, and the sacrifice of their own claims.  *See Ontiveros*, 303 F.R.D. at 366; *see also Flores v. ADT LLC*, 2018 WL 6981043 (E.D. Cal. Mar. 19, 2018) (awarding the "presumptively reasonable" service payment of $5,000 to a plaintiff who "contributed between 50 and 55 hours in assisting in the prosecution").  The Court finds the service payment amount is fair, reasonable, and adequate.  *See Gonzalez*, 2023 WL 373252, at *9 (noting service awards of $5,000 are routinely found reasonable); *see also Vasquez*, 266 F.R.D at 490-491 (finding the requested payment of $5,000 was "reasonable and appropriate").  Thus, the request for service payments to Plaintiffs as the class representatives is **GRANTED** in the amount of **$5,000.00**.

**CONCLUSION AND ORDER**

Based upon the foregoing, the Court finds the class settlement is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the

settlement agreement.  Accordingly, the Court **ORDERS**:

    1.      Plaintiff's motion for final approval of the Settlement (Doc. 46) is **GRANTED**.

    2.      Certification of the Settlement Class is **GRANTED**, and the class is defined as follows:

> all individuals who are or previously were employed by Defendant who worked in California, were classified as non- exempt, and who separated from their employment between March 6, 2014 and February 20, 2018.

    3.      The PAGA award of $50,000 from the Gross Settlement Amount— including payment of **$37,500.00** to California's Labor and Workforce Development Agency, with the remainder distributed to aggrieved employees— is **APPROVED**.

    4.      The request for Class Representative service payments for Conti and Mora (Doc. 45) is **GRANTED** in the amount of $**5,000.00** each.

    5.      Class Counsel's motion for fees in the amount of 25% of the gross settlement fund—in the total amount of **$106,250.00**— (Doc. 45) is **GRANTED**.

    6.      Class Counsel's request for litigation costs in the amount of **$12,000.00** is **GRANTED**.

    7.      Settlement Administration costs in the amount of **$10,725.58**, to be paid from the gross settlement fund, are **APPROVED**.

    8.      The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

    9.      The Clerk of Court is **DIRECTED** to close this action.

    10.      The Court retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:   **July 18, 2023**

UNITED STATES DISTRICT JUDGE